## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**PACIFIC EMPLOYERS INSURANCE COMPANY,**
and **BERMAN BROTHERS, INC.**,
a Florida Corporation,

     **Plaintiffs,**

     **v.**                          **CASE No. 3:05-cv-850-J-16TEM**

**WAUSAU BUSINESS INSURANCE COMPANY,**
a Wisconsin Insurance Company, and
**EMPLOYERS INSURANCE OF WAUSAU,**
a mutual company,

     **Defendants.**
_____/

## O R D E R

This matter comes before the Court upon Plaintiffs (Pacific Employers Insurance Company ("Pacific") and Berman Brothers, Inc. ("Berman")) filing of Motion for Summary Judgment (Dkt. 80) (the "Motion").  Defendants (Wausau Business Insurance Company ("Wausau Business") and Employers Insurance of Wausau ("Employers") (collectively, "Defendants")) filed a Response in Opposition (Dkt. 100)(the "Response").

## I.    **Background**

On August 18, 2000, Mr. Hart was injured while working at Berman. Mr. Hart was assigned to work at Berman by Action Labor, an employment agency.  At the time of Mr. Hart's accident, Action Labor was insured by Pacific[1] and Berman had two insurance policies in place with

---

[1] Pacific Employer's Liability Insurance Policy, No. WLR C43032367 (the "Pacific Policy") was in effect for the period of April 1, 2000, to December 31, 2000.

Defendants (the "Wausau Policies").[2]  Mr. Hart filed a suit for damages stemming from his injuries in Florida's Fourth Judicial Circuit (the "Florida Action").[3] Defendants denied coverage under their policies but continued briefly to defend Berman under a reservation of rights.  On May 29, 2003, Defendants tendered defense of Berman to Pacific.  Due to an "Alternate Employer Endorsement" providing coverage to Berman of $500,000 per accident, Pacific accepted coverage without a reservation of rights and agreed to defend and indemnify Berman. On June 10, 2004, a $2,913,574.28 award was entered against Berman in the Florida Action.  On February 16, 2006, following all appeals of the Florida Action,[4] Berman assigned Pacific all rights to pursue all claims against Defendants.

On August 17, 2005, prior to assigning Pacific all rights to pursue claims against Defendants, Berman filed a declaratory judgment action against Wausau Business in Florida's Fourth Judicial Circuit.  Citing diversity as grounds for jurisdiction, Wausau Business removed the case to federal court on September 8, 2005.  (Dkt. 1).  On July 31, 2006, Berman filed an Amended Complaint (Dkt. 23) that added Pacific as an additional Plaintiff to the action and Employers as an

---

[2]  The Wausau Policies in place at the time of Mr. Hart's accident were a commercial general liability policy, Wausau policy number 0820-00-008266 (the "CGL Policy")(Dkt. 23-2) and an umbrella liability coverage policy, Wausau policy number 0830-02-008266 (the "Umbrella Policy")(Dkt. 23-3).  Both the CGL Policy and the Umbrella policy were in effect from October 1, 1999 to October 1, 2000.

[3]  The original suit filed was Osborne J. Hart v. TECO Energy, Inc., Case No. 01-02595-CA, Division CV-C.  Mr. Hart later filed an amended Complaint that joined Berman as a defendant and alleged that Berman was guilty of conduct which resulted in his injuries.  (Dkt. 23 at p. 2).

[4]  The First District Court of Appeals affirmed the judgment in the Florida Action in Berman Bros., Inc. v. Hart, 915 So.2d 689, 690 (Fla. 1st Dist. Ct. App. 2005).

additional Defendant.  The Amended Complaint asked the Court to determine Defendants'
obligations to Berman and Pacific under the applicable Wausau Policies.

On April 2, 2007, Plaintiffs filed the Motion asking the Court to grant them summary
judgment on the issues raised in the Amended Complaint.  Specifically, Plaintiffs claim that they
are entitled to summary judgment on the issue of whether Defendants owe coverage to Berman for
Mr. Hart's injury because as a "temporary worker" he was covered under the Wausau Policies and
they also claim that the Defendants' affirmative defenses are inapplicable to the instant action.
(Dkt. 80 at p. 1).

Defendants respond that there are genuine issues as to material fact that preclude summary
judgment, including whether "(i) [Mr. Hart] was a "temporary" worker entitled to coverage; (ii)
[Mr. Hart] was a direct or a 'leased worker' employee excluded from coverage; (iii) and, Berman's
prior admission that it was [Mr. Hart's] worker's compensation statutory employer bar[s] coverage.
(Dkt. 100 at p. 1).  Defendants further claim that their third, fourth, seventh, twenty-eighth, thirty-
first, thirty-sixth and thirty-seventh affirmative defenses are valid.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories
and admissions on file, together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(c).

In determining whether to grant summary judgment, the Court must view the evidence and
inferences drawn from the evidence in the light most favorable to the non-movant and resolve all

reasonable doubts in that party's favor.  <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988); <u>WSB-TV v. Lee</u>, 842 F.2d 1266, 1270 (11th Cir. 1988). The Eleventh Circuit explained in <u>Lee</u> that:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted].  The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.  When more than one inference can be reasonably drawn, it is for the trier of fact to determine the proper one.

<u>Id.</u>

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  <u>See</u> <u>Augusta Iron & Steel Works, Inc.</u>, 835 F.2d at 856.

In ruling on a motion for summary judgment, it is well-established that the court may neither adjudge the credibility of the witnesses nor weigh the evidence. <u>See</u> <u>Pita v. State Street Bank and Trust Co.</u>, 666 So.2d 268, 268 (Fla. 3d Dist. Ct. App. 1996) (holding that "[o]n a motion for summary judgment, it is settled that a trial court is not permitted to weigh material conflicting evidence or pass upon the credibility of the witnesses." );  <u>Juno Indus., Inc. v. Heery Int'l</u>, 646 So.2d 818, 822 (Fla. 5th Dist. Ct. App. 1994) (stating that "[t]he trial court may not determine factual issues nor consider either the weight of the conflicting evidence or the credibility of witnesses in determining whether a genuine issue of material fact exists in a summary judgment

4

proceeding." ); <u>Shapiro v. Barron</u>, 538 So.2d 1319, 1320 (Fla. 4th Dist. Ct. App. 1989)(reasoning that "[j]udging the credibility of witnesses or weighing the evidence are not proper subjects of a motion for summary judgment." ); <u>Kuczkir v. Martell</u>, 480 So.2d 700, 701 (Fla. 4th Dist. Ct. App. 1985) (stating that "[w]here the  issue of credibility is present, summary judgment is inappropriate."); <u>State farm Mut. Auto. Ins. Co. v. Gant</u>, 460 So.2d 912, 913 (Fla. 2d Dist. Ct. App. 1984) (holding that "[i]t goes without saying that a trial judge may not, on motion for summary judgment, make evidentiary determinations involving the credibility of witnesses."); <u>Strickland v. Strickland</u>, 456 So.2d 583, 584 (Fla. 2d Dist. Ct. App. 1984) (reasoning that "[a] trial judge may not, on a motion for summary judgment, make determinations involving the weight of the evidence or the credibility of witnesses." ).

## III.    Undisputed Facts

### The Parties

Berman is a scrap metal company located in Jacksonville, Florida founded in the late 1940's by Mr. Milton Berman. (Charles Berman Depo., p. 10, lines 12-19).  Pacific is a Pennsylvania corporation doing business in the State of Florida (Dkt. 23, ¶ 5) and is a member of the ACE Group of companies.  (Dkt. 100-11 at p. 1).  Wausau Business and Employers are both Wisconsin corporations doing business in the State of Florida. (Dkt. 23, ¶¶ 3-4).  Action Labor is an employment or staffing agency, headquartered in West Palm Beach, Florida with local branches in Florida cities, including Jacksonville, Florida. (T. Brown Depo., p. 31, line 25 - p. 32, lines 1-2;

p. 32, lines 5-25 - p. 33, lines 1-4).[5]  Action Labor specializes in providing industrial clients with daily workers.  (T. Brown Depo. at p. 14, lines 24-25 - p. 15, lines 1-11).  Action Labor also provides both short-term and long-term employees to its clients. (T. Brown Depo., p. 35, lines 5-8).

Mr. Charles Berman ("Mr. Berman") is the President of Berman.  (Charles Berman Depo., p. 8, line 5).  Berman's business involves processing scrap metal to mill specifications, so it can be melted and recycled, as well as distributing new steel. (Sworn Stmt. of Peter Krufchinski, p. 6, lines 3-4). Berman has three divisions - ferrous (scrap iron, steel and cast iron), nonferrous (copper, brass and aluminum) and new steel. (Sworn Stmt. of Peter Krufchinski, p. 5, lines 24-25-p. 6, lines 1-13).  Berman's ferrous division cut up scrap iron, steel and cast iron, to process it for sale to mills.  (Dkt. 100, p. 3).  Berman used Action Labor to provide it with skilled and unskilled labor. (Charles Berman Depo., p. 79, lines 24-25 - p. 80 lines 1-3).

**The Railcar Project**

In the mid-1990's, Berman began to receive rail cars and dismantle them for scrap.  (Sworn Stmt. of Peter Krufchinski, p. 8, lines 20-21). In 2000, Berman began cutting up an increasing number of railcars for scrap to be sold to steel mills (the "Railcar Project"). (Charles Berman Depo., p. 23, lines 4-21).  Berman stopped processing rail cars for scrap in 2003. (Sworn Stmt. of Peter Krufchinski, p. 5, lines 24-25-p. 6, lines 1-13).  Berman stopped processing railcars due to lack of profits and the rising cost of railcars. (Sworn Stmt. of Peter Krufchinski, p 11, lines 3-4; Charles Berman Depo., p. 24, lines 23-25 - p. 25, line 1).  Mr. Berman stated that if the price of

---

[5]  Mr. Timothy L. Brown was Action Labor's designated corporate representative.

6

railcars dropped, he would consider processing railcars again. (Charles Berman Depo., p. 25, lines 3-4).

Prior to beginning the railcar cutting and following the conclusion of the cutting in 2003, Berman employed two full time burners. (Charles Berman Depo., p. 65 line 20 - p. 66, lines 1-3). When processing railcars Berman employed three "burners," i.e., a worker who uses a cutting torch to cut large pieces of metal into smaller pieces suitable for sale.  (Charles Berman Depo.,  p. 21, line 13 - p. 22, line 17).  The third burner, Mr. Hart, was provided to Berman by Action Labor through a verbal agreement. (Charles Berman Depo., p. 45, lines 17-25).  Mr. Hart submitted an application for employment at Action Labor on April 27, 2000 (Test. of T. Brown, Dkt. 75-2 at p. 4).  Action Labor records indicate that Mr. Hart reported to Berman from at least May 25, 2000, until the date he was injured, August 18, 2000. (T. Brown Depo., p. 65, lines 18-21).[6]

**Mr. Hart's Employment**

While working at Berman, Action Labor provided Mr. Hart with worker's compensation insurance, paid his payroll taxes and provided him with the income reporting documents required by Internal Revenue Service.  (T. Brown Depo., p. 69; lines 8-15 - p.70, lines 9-19).   While working at Berman, Mr. Hart reported to Mr. Timothy Edenfield, Berman's foreman and Mr. Peter Krufchinski, then Berman's Vice-President of Operations.  Either Mr. Edenfield or Mr. Krufchinski would instruct Mr. Hart what to do during the day and supervise his work. (T. Brown Depo., p. 70, lines 23-25 - p. 1-8). Mr. Edenfield still works at Berman. Mr. Krufchinski has not been employed

---

[6] As will be discussed below, the exact length of Mr. Hart's employment with Berman appears to be in dispute.

at Berman since November 2005. (Dkt. 100 at p. 3, n.4).

While at Berman Mr. Hart would present Mr. Edenfield or Mr. Krufchinski with either a daily or weekly work ticket to sign.  (T. Brown Depo., p. 67, lines 16-21; p. 121, lines 5-14).  Mr. Hart would then return these work tickets to Action Labor at the end of the day or week, depending upon the type of ticket, to receive compensation for his services.  (T. Brown Depo., p. 65, lines 22-25 - p. 66, lines 1-13).  Action Labor would then invoice Berman for the amounts due, as well as provide Berman with a copy of Mr. Hart's daily or weekly work tickets.  (T. Brown Depo., p. 71, lines 19-20; p. 73, lines 18-21).

The "terms and conditions" of employment through Action Labor are listed on the back of each work ticket.  (T. Brown Depo., p. 107, lines 9-15).  Number 9 of the terms and conditions reads that Action Labor is recognized as the employer and the client (Berman) agrees neither to offer employment or other opportunity to an Action labor employee or to accept the services of an Action Labor employee. (T. Brown Depo., p. 107, lines 22-25- 108, line 1).   In addition, Number 9 also reads that if a client wishes to hire an Action Labor employee on a permanent basis, notification of this intent is to be given to Action Labor and the employee will remain on Action Labor's payroll for a period of at least thirty (30) days from the date of notification.  (T. Brown Depo., p. 108, lines 2-7).  Should an Action Labor employee accept employment or additional work without the requisite notification, then the client is required to pay Action Labor $1,500.00 as liquidated damages upon demand.  (T. Brown Depo., p. 108, lines 8-11).

### The Insurance Policies in Place at the Time of Mr. Hart's Accident

On August 18, 2000, Mr. Hart was seriously injured while working at Berman.  At the time

of Mr. Hart's accident, Berman was insured through the Wausau Policies and Action Labor had worker's compensation insurance through Pacific.

The Wausau Policies each contain language excluding coverage for liability incurred by the insured, in this case Berman, due to bodily injury to an "employee" while performing duties related to the conduct of Berman's business (the "Employee Exclusion Provision"). (Dkt. 80-4, pp. 2 and 4). Under the Wausau Policies the term "employee" includes a "leased worker" but does not include a "temporary worker." (Dkt. 80-4, pp. 3-4). The Wausau Policies define a "leased worker" as a person "leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. A 'leased worker' does not include a 'temporary worker.'" (Dkt. 80-4, pp. 3-4). A "temporary worker" is defined as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (Dkt. 80-11 at p. 35). The terms "seasonal" and "short-term" are not defined in the Wausau Policies.

The Pacific Policy provided Action Labor coverage for worker's compensation insurance in amounts up to $500,000.00. The Pacific Policy also provided coverage to Berman of $500,000 per accident under an "Alternate Employer Endorsement." The "Alternate Employer Endorsement" reads, in pertinent part that "[t]his endorsement applies only with respect to bodily injury to your employees while in the course of special or temporary employment by the alternate employer." (Dkt. 80-9).

When Mr. Hart filed the Florida Action, Defendants denied coverage under the Wausau Policies but continued briefly to defend Berman under a reservation of rights. Defendants denied

coverage under the Wausau Policies because they argued that as a "leased" employee, Mr. Hart was excluded from coverage. (Dkt. 80-4). On May 29, 2003, Defendants tendered defense of Berman to Pacific. On June 10, 2004, a $2,913,574.28 award was entered against Berman in the Florida Action. On February 16, 2006, following all appeals of the Florida Action, Berman assigned Pacific all rights to pursue all claims against Defendants. Berman's legal obligation to pay the Florida Judgment has been assumed by Pacific..

### Pertinent Background from the Florida Action, the Declaratory Action and Florida Statutes

During the Florida Action, Berman claimed that it was Mr. Hart's "statutory" employer in order to be entitled to worker's compensation immunity. (Dkt. 100 at p. 13, citing to Ex. G, pp. 1782-83).

When filing the case before this Court Berman referred to Mr. Hart in the original Complaint as a "leased employee." (Dkt. 2 at p. 1, ¶ 6). When filing the Amended Complaint, Berman referred to Mr. Hart as "temporary worker." (Dkt. 23 at p. 2, ¶ 6).

Fla. Stat. § 468.520(4)(a) defines a "temporary help arrangement" as one in which an organization hires its own employees and assigns them to a client to support or supplement the client's workforce in special work situations such as employee absences, temporary skill shortages, seasonal workloads, and special assignments and projects."

Fla. Stat. § 468.520(4) defines a "leasing company" as a company "which assigns its employees to a client and allocates the direction of and control over the leased employees between the leasing company and the client."

10

IV.     **Analysis**

A.       **Preliminary Matters**

The critical issue in this case is whether Mr. Hart was a "temporary" or a "leased" employee while working at Berman.  The answer to this question will determine the coverage issue pending before the Court - whether Pacific or Wausau is responsible for the $2,913,574.28 judgment awarded to Mr. Hart in the Florida Action.  If it is determined that Mr. Hart was a "temporary" employee then Berman must be indemnified under the Wausau Policies for Mr. Hart's injuries.  If it is determined that Mr. Hart is a "leased" employee then Mr. Hart is excluded from coverage under the Wausau Policies and responsibility for the judgment against Berman remains with Pacific.

**Scope of the Issues Before the Court**

Coverage is the <u>sole</u> issue pending before the Court and is the only issue properly raised in this case.  Defendants' allegations of bad faith and the affirmative defenses associated with these allegations are not properly before this Court and were not raised by Plaintiffs in the Motion; therefore, they will not be addressed in this Order.

Plaintiffs argued in the Motion that they are entitled to summary judgment on all thirty-seven affirmative defenses raised by Defendants.   In the Response, Defendants argued that they have "asserted several valid affirmative defenses which negate or limit [their] liability to Plaintiffs under the facts at issue."  (Dkt. 100, pp.16-17).  Defendants then address and provide arguments in support of the validity of only seven of their affirmative defenses (the third, fourth, seventh, twenty-eighth, thirty-first, thirty-sixth and thirty-seventh affirmative defenses).   The other

affirmative defenses that Defendants failed to support in the Response are waived and are no longer before the Court. See Gilbert v. Walt Disney Parks and Resorts, LLC, WL 1863367 * 7 (Aug. 3, 2005) (failure to respond to claim in an opposition memorandum results in the claim being waived). Because, by Defendants' own admissions, the third and fourth affirmative defenses concern alleged bad faith, they will not be considered by the Court.

### Applicable Law

As a federal court sitting in a diversity case, the Court must apply the choice of law rules of the state in which the action was brought. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020 (1941). Florida courts apply the doctrine of *lex loci contractus* to choice of law issues involving contractual disputes. See Prime Ins. Syndicate v. B.J. Handley Trucking, 363 F. 3d 1089, 1091 (11 th Cir. 2004) (stating that *lex loci contractus* is fact-intensive and requires determination of where the last act necessary to complete the contract is done). *Lex loci contractus* provides that the laws of the jurisdiction where the contract was executed governs interpretation of the substantive issues regarding the contract. Id. (citing Lumbermen's Mut. Cas. Co. v. August, 530 So.2d 293, 295 (1988)). While neither party has provided the Court with definitive evidence that the Wausau Policies and the Pacific Policy were executed in Florida, neither of the parties disputes that Florida law applies to this action.

### B.    Does the Employee Exclusion Provision in the Wausau Policies Apply to Mr. Hart?

The Wausau Policies each contain the same  Employee Exclusion Provision[7] which provides, in pertinent part, that the policy does not cover bodily injury to an "employee" of Berman arising out of and in the course of or performing duties related to the conduct of Berman's business. (Dkt. 80 at p. 6).  Under the Wausau Policies the term "employee" includes a "leased worker" but does not include a "temporary worker." (Dkt. 80-4, pp. 3-4).  The Wausau Policies define a "leased worker" as a person "leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business.  (Dkt. 80-4, pp. 3-4).  A "temporary worker" is defined as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." (Dkt. 80-11 at p. 35).  The terms "seasonal" and  "short-term" are not defined in the Wausau Policies.

Because Mr. Hart's severe bodily injuries occurred while he was working at Berman, Defendants do not have a duty to indemnify Berman if Mr. Hart was an "employee" as defined by the Wausau Policies.  Based on the Wausau Policies, Mr. Hart was an "employee" if he was not a "temporary worker."  Thus, this case turns on whether Mr. Hart was "temporary worker" and not a "leased worker" (and as such an employee of Berman) on the date of his accident.

Plaintiffs assert that they are entitled to summary judgment because the facts of the case require the Court to find that Mr. Hart was not a "temporary worker."  In support of this position Plaintiffs provided the Court with numerous compelling facts.

In contrast, Defendants assert that there are genuine issues as to material facts that preclude

---

[7] Provisions akin to the Employee Exclusion Provision are fairly typical, especially in Commercial General Liability policies and have been enforced in Florida for many years.

13

summary judgment including whether Mr. Hart was a "temporary worker" entitled to coverage or a "leased worker" excluded from coverage.  In support of their position, Defendants provided the Court with the numerous compelling facts.

### Contract Construction Law

Under Florida law, an insurance policy is treated like a contract, and therefore ordinary contract principles govern the interpretation and construction of such a policy. As with all contracts, the interpretation of an insurance contract is a question of law to be determined by the court. See Graber v. Clarendon Nat'l Ins. Co., 819 So.2d 840, 842 (Fla. 4th Dist. Ct. App. 2002). Determining whether an insurance provision is ambiguous is a question of law for the Court. Travelers. Indem. Ins. Co. of Illinois v. Hutson, 847 So.2d 1113 (Fla. 1st  Dist. Ct. App. 2003)(stating that whether an ambiguity exists in a contract is a matter of law).  It is well-established in Florida that an "insurer, as the writer of an insurance policy, is bound by the language of the policy, which is to be construed liberally in favor of the insured and strictly against the insurer.  Berkshire Life Ins. Co. v. Adelberg, 698 So.2d 828, 830 (Fla. 1997).  Therefore, if there is an ambiguity in an insurance policy, that ambiguity should be construed against the insurer. Purelli v. State Farm Fire & Cas. Co., 698 So.2d 618, 620 (Fla. 2d Dist. Ct. App. 1997).

Policy language is considered ambiguous if the language is susceptible to more than one reasonable interpretation.  See Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 785 (Fla. 2004); see also Cont'l Cas. Co. v. Wendt, 205 F.3d 1258, 1261 (11th Cir. 2000).  The courts have, however, cautioned that the fact that a word or phrase is undefined in an insurance policy does not necessarily render that term or phrase ambiguous and in need of interpretation by the court. See

14

State Farm Fire & Cas. Co v. CTC Development Corp., 720 So.2d 1072, 1076 (Fla. 1998).  In arriving at a reasonable interpretation, the "terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced, or unrealistic construction." See Siegle, 819 So.2d at 736.  Moreover, "when a policy provision remains undefined, common everyday usage determines its meaning." See Nateman v. Hartford Cas. Ins. Co., 544 So. 2d 1026, 1028 (Fla. 3d Dist. Ct. App 1989); see also Hrynkiw v. Allstate Floridian Ins. Co., 844 So.2d 739, 741-42 (Fla. 5th Dist. Ct. App. 2003) ("When determining the meaning and scope of an exclusion clause or other provisions of an insurance policy, legal niceties, technical terms, and phraseology extracted from the vernacular of the insurance industry should never transcend the common understanding of the ordinary person. Therefore, the proper inquiry is not whether a legal scholar can, with learned deliberation, comprehend the meaning of an insurance policy provision, but instead, whether it is understandable to a layperson. [The court] will apply everyday meaning to the language of the instant policy and not strain for a contrary interpretation.").

In general, coverage clauses in insurance policies are interpreted in the broadest possible manner to effect the greatest amount of coverage. See Westmoreland v. Lumbermens Mut. Cas. Co., 704 So.2d 176, 179 (Fla. 5th Dist. Ct. App. 1997).  In contrast, exclusionary clauses are strictly construed, again in a manner that affords the insured the broadest possible coverage.  Id. A court may look to parol evidence in interpreting an insurance contract only if there is ambiguity. Fireman's Fund Ins. Co. v. Tropical Shipping and Const. Co., 254 F.3d 987, 1003 (11th Cir. 2001).

Determining if the Employee Exclusion Provision is ambiguous is the first step in the Court's analysis.   Plaintiffs argue that the Employee Exclusion Provision is ambiguous. Defendants argue that it is not ambiguous. Upon review the Court finds that the Employee Exclusion Provision is not ambiguous - the interpretation of the facts is.

The Court finds the Employee Exclusion Provision to be ambiguous not because the language is unclear, with the one notable exception of the word "short-term," but rather because under the Employee Exclusion Provision and the facts of this case presented to date by the parties, Mr. Hart's employment status at the time of his injury is susceptible to more than one interpretation.  He could be found to be either a "leased worker," and thus, an "employee" excluded from coverage under the Wausau Policies or a "temporary worker," thus, not an employee, and covered under the Wausau Policies.

As the Eleventh Circuit has noted, when "both interpretations provide reasonable constructions, the phrase is clearly ambiguous."  Arriaga v. Florida Pacific Farms, LLC, 305 F.3d 1228, 1246 (11th Cir. 2002) (citing Royal Am. Realty, Inc. v. Bank of Palm Beach and Trust Co., 215 So.2d 336, 338 (Fla. 4th Dist. Ct. App. 1968), for the proposition that contract language is ambiguous where "it is, in fact reasonably or fairly susceptible to the different constructions being advocated by the parties.")

While it is not necessary for the court to review all of the differing "facts" presented by the parties, below the Court touches on a few of the material facts in dispute in this case.

**The Length of Mr. Hart's Employment with Berman**

The exact amount of time that Mr. Hart worked at Berman prior to his accident is not clear.

16

Mr. Krufchinski claimed in his Sworn Statement that Mr. Hart was employed by Berman for "at least a year." (Sworn Stmt. of Peter Krufchinski, p. 13, lines 20-23). However, during the state court trial, Mr. Krufchinski stated that Mr. Hart had been employed for only a "couple of months." (Dkt. 76-2 at p. 4). Yet, despite this testimony provided from the Florida Action, defendants claim in the Response that Mr. Hart was employed at least a year prior to his injury, i.e., on or before August 18, 1999. (Dkt. 100 at p. 3).  During the Florida Action, Mr. Hart claimed that he was employed by Berman for "around five months or five-and-a-half months or four-and-a-half, something in that category." (Dkt. 77-2 at p. 23).  In his deposition, Mr. Berman stated that Mr. Hart had been employed by Berman for "a couple of months." (Charles Berman Depo., p. 47, lines 4-5).  In his deposition, Mr. Brown stated that Mr. Hart had been employed with Berman for "three months." (T. Brown Depo., p. 88, lines 11-14).  Mr. Sidney Bush, a claims supervisor at Wausau Business, stated that the investigation report for Mr. Hart's accident indicated that Mr. Hart had been employed by Berman for "[f]ive months." (Dkt. 71-3 at p.15; S. Bush Depo., p. 74, line 18).

Based on the above, the length of Mr. Hart's employment, a very material fact to determining whether he was a "temporary employee" or not, is in dispute.  To make a determination as to the exact length of time Mr. Hart was employed at Berman prior to his accident will require the Court to evaluate the credibility of the witnesses and to weigh the evidence that they present.

### "Temporary Worker" and "Short-Term" under the Wausau Policies

The Wausau Policies define a  "temporary worker" as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload

conditions." (Dkt. 80-11 at p. 35). It is clear from the facts and deposition testimony, and it is undisputed that Mr. Hart was neither a "replacement for a permanent 'employee'" nor a "seasonal employee" while at Berman. Thus, in order to be deemed a "temporary" worker under the Wausau Policies, Mr. Hart would have to have been hired to meet a "short-term" workload condition. "Short-term" is not defined in the Wausau Policies.

Plaintiffs argue that because it is impossible to read the Wausau Policies and definitively determine how long a "short-term" project can last, the Employee Exclusion Provision is ambiguous. Plaintiffs further claim that "short-term" should be defined in accordance with Fla. Stat. § 468.520(4)(a), which defines a "temporary help arrangement" as one in which an "organization hires its own employees and assigns them to a client to support or supplement the client's workforce in special work situations such as employee absences, temporary skill shortages, seasonal workloads, and special assignments and projects."

Seizing on the "special projects" language of the statute, Plaintiffs claim that Mr. Hart is clearly a temporary worker, because in accordance with Fla. Stat. § 468.520(4), he was hired on a temporary basis to complete a "special project" for Berman. The special project to which Plaintiffs refer is the "Railcar Project." According to Plaintiffs, the Railcar Project was an experimental project Berman started in 2000, and the cutting of old railcars for scrap was not done in its ordinary course of business. (Dkt. 80 at p. 5, citing to Charles Berman Depo., p. 203, lines 2-6). Plaintiffs further claim that the Railcar Project qualifies as short-term because "at most" it lasted five (5) years. (Dkt. 80 at p. 10).

In contrast, Defendants claim, in accordance with the Massachusetts' court's conclusion in

Scottsdale Ins. Co. v. Carrabassett Trading Company, 460 F. Supp. 2d 251, 258 (D. Mass. 2006), and following the definition of "short-term" in the Cambridge Advanced Learner's Dictionary (2007), the plain meaning of the word "short-term:" "suggests a period of time that is relatively brief and relatively finite.  For example, someone hired to complete a specific project or responding to an unexpected, temporary demand in goods or services could reasonably be said to have been furnished to meet 'short-term' workload conditions.   Conversely, 'short-term' cannot mean 'indefinite' or 'open-ended.'" (Dkt. 100 at p. 10, citing to Scottsdale, 460 F. Supp. 2d at 258). Defendant's claim that Mr. Krufchinski's sworn statement expressly states that Mr. Hart was not "brought on to [Berman] to meet short term workload condition" at Berman.  (Dkt. 100 at p. 10). Defendants further claim that had Mr. Hart not been injured, he would have continued working at Berman indefinitely and would have been offered permanent employment. (Sworn Stmt. of Peter Krufchinski, p. 16, lines 17-21).

Defendants also claim that Plaintiffs' "reliance on the "special assignments and projects" language in Fla. Stat.§ 468.520(4) is "misplaced" because the Railcar Project was not a special project at all.  (Dkt. 100 at p. 8).  Defendants claim that the railcars dismantled by Mr. Hart and the other burners were simply another source of scrap used by Berman as part of its regular and ordinary business of processing scrap metal.  Defendants further claim that Berman had been using railcars as a source of scrap for nine years and began processing a high-volume of railcars for scrap in 1997, which it continued to do until processing railcars became unprofitable in 2003. (Dkt. 100 at p. 3).  Defendants also note that Mr. Hart did not work solely on the Railcar Project, but that he also cut "common"up for scrap when he was required to do so.  (Dkt. 100 at p. 3).

Clearly, the exact nature of the Railcar Project, a "special project" or part of Berman's regular and ordinary course of business, is in dispute.  Resolution of this dispute is important to determining the exact parameters of the word "short-term."  How the Court defines short-term will be a significant factor in determining whether Mr. Hart is a temporary or a leased worker under the Wausau Policies.  Thus, on these points there are genuine issues of material fact that preclude summary judgment.

### Action Labor - Temporary Firm or Leasing Agency?

Plaintiffs claim that Action Labor is a temporary help firm.  In support of this position, Plaintiffs point to the court's decision in Action Labor of Florida, Inc. v. Liberty Mutual Inc. Co., et al., 879 So.2d 1240 (Fla. 3d Dist Ct. App 2004), in which the court determined that Action Labor was a temporary help firm because Action Labor only supplied workers to be utilized by the client as opposed to Action Labor itself performing the work by contract.

In contrast, Defendants claim that Action Labor is a leasing company.  In support of this proposition, Defendants  rely on Fla. Stat. § 468.520(4), which defines a "leasing company" as a company that "assigns its employees to a client and allocates the direction of and control over the leased employees between the leasing company and the client."

Both Plaintiffs and Defendants also provide the Court with many specifics regarding the "agreement" between Action Labor and Berman as to Mr. Hart's employment, as well as information about how Mr. Hart was compensated and supervised while working at Berman. Review of these facts  makes clear that on these points genuine issues of material fact preclude summary judgment as to whether Action Labor is temporary help firm or a leasing company.

20

**"Leased Worker" under the Wausau Policies**

As noted above, the Wausau Policies define a "leased worker" as a person "leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. (Dkt. 80-4, pp. 3-4).

As demonstrated above, material facts remain in dispute about what type of agency Action Labor is and whether Mr. Hart was hired to work on a special project or not, determination of which facts are necessary prerequisites to deciding whether Mr. Hart was a "leased worker" at the time of his accident. Accordingly, summary judgment cannot be granted on this issue.

In summary, while Plaintiffs present compelling evidence that Mr. Hart was a "temporary" worker, Defendants present equally compelling evidence that Mr. Hart was a "leased" worker. In order to make a final determination about whether Mr. Hart was a temporary or a leased worker at the time of his accident, the Court will to have to "adjudge the credibility of the witnesses and weigh the evidence" presented, which it is not permitted to do on a motion for summary judgment. See Pita v. State Street Bank and Trust Co., 666 So.2d 268, 268 (Fla. 3d Dist. Ct. App. 1996) (holding that "[o]n a motion for summary judgment, it is settled that a trial court is not permitted to weigh material conflicting evidence or pass upon the credibility of the witnesses.").

Thus, having viewed the evidence in the light most favorable to Defendants, the Court finds that genuine issues of material fact preclude summary judgment in favor of Plaintiffs as to Mr. Hart's employment status at the time of his accident. In reaching this determination, however, the Court has reached certain conclusions that will have a bearing on the upcoming trial in this case.

First, because the Employee Exclusion Provision is ambiguous, the Court will consider parol

evidence and accord it the weight that it deserves during the trial.  The Court's consideration of parol evidence will include Berman's admission in the Florida Action that it was Mr. Hart's "statutory employer." Plaintiffs argue that Worker's Compensation Act definitions and insurance policy interpretation should not be conflated; however, at least one Florida court has applied the definition of "statutory employee" from worker's compensation law when considering the definition of an "employee" in an insurance policy.  See Dodge v. Fidelity & Casualty Company of New York, 424 So.2d 39, 41 (Fla. 5th Dist. Ct. App. 1982) (affirming the trial court's determination that the "term employee in the policy should be construed to include 'statutory employees' as that term is used in the worker's compensation law.").

Second,  the Court notes that usually when there is an ambiguity in an insurance policy, that ambiguity should be construed against the insurer.  Purelli v. State Farm Fire & Cas. Co., 698 So.2d 618, 620 (Fla. 2d Dist. Ct. App. 1997). This case, however, presents a slightly different scenario than that of insured vs. insurer, where there will be no coverage for the insured if the ambiguity in the insurance provision is not construed against the insurer.   In this case, the question is which insurer will provide coverage.  The parties in this case are all sophisticated business entities, not hapless lay people.  The public policy behind the strict construction against the insured is to protect lay people; thus,  it is not as clearly applicable in this case.  See 16 Williston on Contracts §49:15 (4 th ed.), explaining the public policy behind favoring the insured when there is ambiguity in an insurance contract as follows:

> The fundamental reason which explains this and other examples of judicial predisposition toward the insured is the deep-seated, often unconscious but justified feeling or belief that the powerful underwriter, having drafted its

several types of insurance contracts with the aid of skillful and highly paid legal talent, from which no deviation desired by an applicant will be permitted, is almost certain to overreach the other party to the contract. The established underwriter is magnificently qualified to understand and protect its own selfish interests. In contrast, the applicant is a shorn lamb driven to accept whatever contract may be offered on a "take-it-or-leave-it" basis if he or she wishes insurance protection. In other words, insurance policies, while contractual in nature, are certainly not ordinary contracts, and should not be interpreted or construed as individually bargained for, fully negotiated agreements, but should be treated as contracts of adhesion between unequal parties.

Third, in cases in which an insurance provision is ambiguous, the Florida Supreme Court has soundly rejected the notion that the parties' "reasonable expectations" should be considered by the Court when construing insurance policy provisions.  In <u>Deni Assocs. of Florida, Inc. v. State Farm Fire & Casualty Insurance Co.</u>, 711 So.2d 1135, 1140 (Fla. 1998), the Florida Supreme Court stated:

> We decline to adopt the doctrine of reasonable expectations.  There is no need for it if the policy provisions are ambiguous because in Florida ambiguities are construed against the insurer.  To apply the doctrine to an unambiguous provision would be to rewrite the contract and the basis on which premiums are charged . . . Construing insurance policies upon a determination as to whether the insured's subjective expectations are reasonable can only lead to uncertainty and unnecessary litigation.

Thus, during the trial in this case, the Court will not entertain "reasonable expectations" testimony from any party.

## C.   Affirmative Defenses

Of the original thirty-seven affirmative defenses initially raised by Defendants, only five remain before the Court.  These are Defendants' seventh (other insurance available); twenty-eighth and thirty-first (alleging that Wausau's potential liability and Plaintiffs' potential damages are

limited by the policy limits in the Wausau Policies); and, thirty-sixth and thirty-seventh (alleging that the Pacific policy is primary and the Wausau Policies are excess and therefore Plaintiffs are not entitled to the relief sought in this case) affirmative defenses.

In light of Defendants' affirmative defenses, in order for Plaintiffs to obtain summary judgment they must either disprove the affirmative defenses raised by evidence or establish the legal insufficiency of the defenses. See Stewart v. Gore, 314 So.2d 10 (Fla. 2d Dist. Ct. App. 1975). Plaintiffs have not provided the Court with sufficient evidence to disprove the remaining affirmative defenses; thus, Plaintiffs' request that the Court grant them summary judgment on these affirmative defenses is **DENIED**.

In addition, the Court notes that the affirmative defenses remaining are defenses that do not bar the declaratory action from going forward; rather, the remaining defenses, if applicable, would act as a limit on Defendants' liability to Plaintiffs in the event that it is determined that the Wausau Policies provide coverage for the judgment in the Florida Action.

## V.    Conclusion

The Motion (Dkt. 80), in accordance with the above, is **GRANTED in PART** to the extent that the Court finds the Employee Exclusion Provision is ambiguous and **DENIED in PART** as to the remainder of the relief requested.

**DONE AND ORDERED** in Chambers at Jacksonville, Florida on this 13th day of June 2007.

JOHN H. MOORE II
United States District Judge

Copies to:  Counsel of Record