**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

PACIFIC EMPLOYERS INSURANCE COMPANY,
and BERMAN BROS., INC.,
a Florida Corporation,

      Plaintiffs,

      v.                                Case No. 3:05-cv-850-J-32TEM

WAUSAU BUSINESS INSURANCE COMPANY,
a Wisconsin Insurance Company, and
EMPLOYERS INSURANCE OF WAUSAU,
a Mutual Company,

      Defendants.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

**Introduction**

Plaintiffs, Berman Bros., Inc. ("Berman") and Pacific Employers Insurance Company

("Pacific") seek a declaration from the Court entitling Berman to coverage under two

insurance policies issued by Defendants, Wausau Business Insurance Company ("Wausau

Business") and Employers Insurance of Wausau ("Employers") (collectively "Wausau").

The policies - - a commercial general liability ("CGL") policy (the "CGL Policy") (PX 1)[2]

and an umbrella liability coverage policy (the "Umbrella Policy") (PX 2) (collectively, the

---

[1] This Order is being issued only to decide this case and is not intended for official
publication or to serve as precedent.

[2] This Order refers to Plaintiffs' Exhibits as "PX __" and Defendants' Exhibits as "DX
___."

"Wausau Policies")[3] - - were issued to Berman.  Specifically, Plaintiffs seek a declaration of entitlement to coverage under the Wausau Policies for liability incurred by Berman in a state court action brought by Osborne Hart ("Hart").  Hart sued Berman for injuries sustained while working at Berman.

Hart was not as a regular Berman employee; rather, Berman employed an outside company, Action Labor, to procure some of its workers, including Hart.  Action Labor employed Hart. The Wausau Policies exclude from coverage bodily injury to Berman employees; this exclusion includes "leased workers."  However, if Hart was a "temporary worker" coverage applies.  Accordingly, this case requires a determination of whether, under the Wausau Policies, Hart qualifies as a "temporary worker," a "leased worker" or both.

The parties raised other legal theories and Wausau raised other defenses to coverage, but following the trial, the Court asked the parties to limit their post-trial briefing to the "leased worker"/"temporary worker" issue.  Because the Court finds this issue dispositive, it need not address the other issues.

The Court conducted a two day bench trial in August 2007.  Tim Brown ("Brown"), former District Manager of Action Labor's North Florida district (Brown T.1:27),[4] and Charles Berman ("Mr. Berman"), President of Berman, testified  as witnesses for Plaintiffs.  Through videotaped depositions Plaintiffs also produced Al Greasby ("Greasby") and Tom

---

[3]  Both the CGL Policy, Wausau policy number 0820-00-008266, and the Umbrella Policy, Wausau policy number 0830-02-008266, were in effect from October 1, 1999 to October 1, 2000, which includes the date of the incident at issue.

[4]  Trial testimony is cited as [Witness Name] T. [Vol.#]:[page no(s).]

2

DeRosia ("DeRosia"), both Wausau claims representatives. Peter Krufchinski ("Krufchinski"), former Vice-President of Operations at Berman, testified as a witness for Defendant. Through deposition testimony, Defendants also produced John F. McDeavitt and Thomas Eason, both representatives of ACE Group, the parent company of Pacific.

Having reviewed the pleadings, examined the evidence, observed the witnesses, read the parties' post-trial memoranda, and considered the arguments, the Court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## I. Facts and Applicable Law

### A. The Parties[5]

Berman, founded in the late 1940s, is a scrap metal company located in Jacksonville, Florida. Mr. Berman is the President of Berman. Berman includes three divisions - ferrous (scrap iron, steel and cast iron), nonferrous (copper, brass and aluminum) and new steel. Berman's ferrous division cuts up scrap iron, steel and cast iron to process it for sale to mills.

Beginning in 1999 or 2000, Berman accepted railcars at its scrap yard to dismantle for scrap. (Krufchinski T.2:44).[6] Berman assigned no specific name to the processing of railcars during the three-year period from 2000 through 2003 when it processed them. (Berman T.1:112). When processing railcars onsite, Berman employed as few as three and

---

[5] The Court has considered all of the evidence admitted at trial. The Court does not include evidence that it has rejected as unreliable or that it finds irrelevant.

[6] Prior to 2000, Berman sent workers offsite to process railcars for scrap. (Krufchinski T.2:33).

as many as six "burners," i.e., a worker who uses a cutting torch to cut large pieces of metal into smaller pieces thereby rendering them suitable for sale. (Krufchinski T.2:46). Before accepting railcars at its scrap yard, Berman employed only two full time burners.  (Berman T.1:144).

In 2000, Action Labor provided Hart to Berman to work as a burner.  Action Labor records show that Hart reported to Berman continuously from at least May 25, 2000, (Brown T.1:38, 39-40, 60; PX 18, YBFR 4189) until the date he was injured - August 18, 2000 - a little less than three months.[7]

Before the accident, Hart reported to Berman's then foreman, Timothy Edenfield ("Edenfield"), or Berman's then Vice-President of Operations, Krufchinski.  Either Edenfield or Krufchinski would instruct Hart and supervise his work.[8]  (Krufchinski T.2:36-37).  Hart worked on cutting railcars and "out . . . in the yard" as needed to create scrap iron. (Krufchinski T.2:36).  But for his injury, Hart would have continued to "cut scrap" at Berman indefinitely.  (Berman T.1:103-05, 109-10, 128-29, 132-34; Brown T.1:54-55, 60-61; Krufchinski T.2:36-39).

Action Labor is an employment or staffing agency, with a local branch in Jacksonville.  Action Labor specializes in providing industrial clients with daily workers,

---

[7]  The Court finds that the daily and weekly work tickets submitted by Hart to Action Labor are the most reliable indicator of the actual time that Hart worked at Berman.  (PX 18, YBFR 4174-4225).

[8]  Berman terminated Krufchinski's employment in October 2005. (Krufchinski T.2:41-42).

4

both on a short-term and long-term basis.  During the time Hart worked at Berman, Action Labor provided his workers' compensation insurance, paid his payroll taxes, and provided him the income reporting documents required by Internal Revenue Service.

While working at Berman, Hart presented Edenfield or Krufchinski with either a daily or weekly work ticket to sign.  Hart then returned these work tickets to Action Labor.  Upon receipt of his ticket, Action Labor paid Hart directly.  Action Labor then invoiced Berman for the amounts due and provided Berman a copy of Hart's daily or weekly work tickets. Berman then paid Action Labor.[9]

Action Labor lists "terms and conditions" of employment on the back of each work ticket.  (PX 13, YBFR 45).  The terms and conditions identify Action Labor as the "employer" and a company like Berman as the "client."  Term and condition Number 9 ("Number 9") provides that the client agrees neither to offer employment or other opportunity to an Action Labor employee nor to accept the services of an Action Labor employee apart from the Action Labor contract.  (Brown T.1:47-48).  In addition, Number 9 states that if wishing to hire an Action Labor employee on a permanent basis, the client must notify Action Labor at least thirty days before the first date of permanent employment.

---

[9] Action Labor charged Berman an hourly rate for Hart's services.  The hourly rate was comprised of Hart's actual salary and an amount to cover Action Labor's overhead costs and to provide Action Labor with profit.  (Brown T.1:64-65).  See also Dkt. 100 at p. 5 reading, in pertinent part that "Action Labor paid Hart $8 per hour, but invoiced Berman at a rate of $15 per hour - $7 per hour fee which covered its overhead, taxes, insurance costs, with the remainder as profit."

B.    The Insurance Policies

On August 18, 2000, Hart was seriously injured while working at Berman.  Pacific provided coverage to Action Labor (and to Berman under an "Alternate Employer Endorsement") under a workers' compensation and employer's liability policy (the "Pacific Policy"). (DX 13).  Action Labor also maintained a commercial umbrella liability policy with Pacific that covered claims in excess of its underlying workers' compensation and employer's liability policy.  (DX 14).

At the time of Hart's accident, Berman also had commercial general liability coverage under the Wausau Policies.  The Wausau Policies each contain language excluding coverage due to bodily injury to an "employee" while performing duties related to the conduct of Berman's business (the "Employee Exclusion Provision").[10]  Thus, if at the time of the accident, Hart was an "employee" of Berman within the meaning of the Wausau Policies, this coverage exclusion would apply and there is no coverage.  Under the Wausau Policies the term "employee" includes a "leased worker" but not a "temporary worker."[11]

---

[10]  The Employee Exclusion Provision reads, in pertinent part that "[t]his insurance does not apply to . . . [b]odily injury' to [a]n 'employee' of the insured arising out of and in the course of: (a) Employment by the insured; or (b) Performing duties related to the conduct of the insured's Business . . . ." (DX 1, RP 106-107, 120; DX 2, RP 248, 261).

[11]  An employer customarily obtains commercial general insurance "to cover its liability to the public for negligence of its agents, servants and employees under the doctrine of *respondeat superior*." See Ward v. Curry, 341 S.W.2d 830, 837 (Mo. 1969) (emphasis omitted). "The intent of a commercial general liability policy is to protect against the unpredictable and potentially unlimited liability that can result from accidents causing injury to other persons on the insured's property."  American Family Mut. Ins. Co. v. Tickle, 99 S.W.3d 25, 29 (Mo. Ct. App. 2003) (internal citations omitted).  "A commercial general liability policy does not cover an insured's obligations under a workers' compensation policy [nor does it cover] bodily injury to

The Wausau Policies define a "leased worker" as a person "leased to you [Berman] by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. A 'leased worker' does not include a 'temporary worker.'"  The Wausau Policies define a "temporary worker" as "a person who is furnished to you to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions."  All agree that Hart served as neither a "replacement for a permanent 'employee'" nor as a "seasonal employee."  Thus, to qualify as a "temporary

the insured's employees arising out of the employment." Id.  As the court stated in Florida Ins. Guar. v. Revoredo, 698 So. 2d 890, 892 (Fla. 3d Dist. Ct. App. 1997), "the only coverage intended [by CGL policies] and for which the premium has been paid, is the liability of the insured to the public, as distinguished from liability to the insured's employees."  It is the employer's liability policy that is intended to cover an employer's liability to its employees.  See Travelers Indem. Co. v. PCR Inc., 889 So. 2d 779, 784 n.7 (Fla. 2004) (stating "a workers' compensation insurance policy is issued together with an employer's liability insurance policy, with the latter intended to serve as a 'gap-filler,' providing protection to the employer in those situations where the employee has a right to bring a tort action despite the provisions of the workers' compensation statute.").

A CGL policy denies coverage for harm to employees through an employee exclusion provision. The Employee Exclusion Provision at issue here is derived from the copyrighted provisions of the Insurance Services Office, Inc. ("ISO").  Employee exclusion provisions, now common in commercial general liability insurance policies, serve to ensure the distinction noted above between commercial general liability coverage and employer's general liability coverage. See Couch on Insurance Section 129:3 (3d ed. 1997) ("The primary purpose of an employee exclusion clause is to draw a sharp line between employees and members of the general public.").

The ISO added definitions of "employee," "leased worker" and "temporary worker" to its form of the employee exclusion provision in 1993 to cover the "non-traditional employment relationship where a client company is using the services of employees of a staffing company." Id. at 30 (internal citations omitted).  The addition included "leased workers" within the definition of "employee" but exempted "temporary workers" from the exclusion.  Id.; see also General Agents Ins. Co. of America, Inc. v. Mandrill Corp., Inc., 2007 WL 2050850 (6th Cir. July 13, 2007) (discussing the history and purpose of employee exclusion provisions).

worker" under the Wausau Policies, Berman must have hired Hart to meet "short-term workload conditions."  The Wausau Policies do not define "short-term."

C.    The Florida Action[12]

Hart sued Berman in Florida's Fourth Judicial Circuit for the injuries sustained on August 18, 2000, during his work at Berman.  Initially, Wausau defended Berman subject to a reservation of rights.  Wausau then denied coverage under the Wausau Policies claiming Hart was a "leased worker," and therefore was excluded from coverage.  On May 29, 2003, Wausau tendered defense of Berman to Pacific.  The Florida Action resulted in a judgment of $2,913,574.28 in favor of Hart and against Berman (the "Florida Judgment"). The First District Court of Appeals affirmed.[13]

On February 16, 2006, following all appeals of the Florida Action, Berman assigned Pacific all rights to pursue all claims against Wausau. Pacific assumed and ultimately satisfied the Florida Judgment.

During the Florida Action, Berman claimed that it was Hart's "statutory employer" in order to be entitled to workers' compensation immunity.  (Dkt. 15-8 at p. 5).  Moreover, Berman's original complaint in this case defines Hart as a "leased employee," (Dkt. 2 at p. 1, ¶ 6), the opposite of its position now.  Only much later, when filing its amended complaint,

---

[12]  The original suit filed was <u>Osborne J. Hart v. TECO Energy, Inc.</u>, Case No. 01-02595-CA, Division CV-C.  Hart later filed an amended complaint joining Berman as a defendant alleging that Berman was guilty of the conduct that resulted in his injuries.  Before trial, the Court took judicial notice of this action.

[13]  <u>See</u> <u>Berman Bros., Inc. v. Hart</u>, 915 So. 2d 689 (Fla. 1st Dist. Ct. App. 2005).

8

did Berman refer to Hart as a "temporary worker." (Dkt. 23 at p. 2, ¶ 6).  Wausau claims that

these are admissions by Berman that can be used to weaken or even destroy Berman's current

position that Hart was not a "leased worker."  Berman strongly resists this effort and even

claims Wausau may have made some damaging admissions of its own.  However, in reaching

its decision the Court has chosen not to consider whether these positions constituted

admissions by Wausau; the Court has determined to decide this case based on the language

of the Wausau Policies as applied to the facts, unaided by any admissions.

D.    Previous Determinations

Before the transfer of this case to the undersigned for trial, Judge Moore entered an

Order on Plaintiffs' Motion for Summary Judgment (Dkt. 108)[14] setting forth the applicable

principles of policy interpretation and construction:

> Under Florida law, an insurance policy is treated like a contract, and
> therefore ordinary contract principles govern the interpretation and
> construction of such a policy.  As with all contracts, the interpretation of
> an insurance contract is a question of law to be determined by the court.
> See Graber v. Clarendon Nat'l Ins. Co., 819 So. 2d 840, 842 (Fla. 4th
> Dist. Ct. App. 2002).  Determining whether an insurance provision is
> ambiguous is a question of law for the court.  Travelers. Indem. Ins. Co.
> of Illinois v. Hutson, 847 So. 2d 1113 (Fla. 1st Dist. Ct. App. 2003)
> (stating that whether an ambiguity exists in a contract is a matter of law).
> It is well-established in Florida that an "insurer, as the writer of an
> insurance policy, is bound by the language of the policy, which is to be
> construed liberally in favor of the insured and strictly against the
> insurer."  Berkshire Life Ins. Co. v. Adelberg, 698 So. 2d 828, 830 (Fla.
> 1997).  Therefore, if there is an ambiguity in an insurance policy, that
> ambiguity should be construed against the insurer.  Purelli v. State Farm

---

[14] Docket 108 appears on Westlaw by the citation,  Pacific Employers Ins. Co. v. Wausau
Business Ins. Co., 2007 WL 1729971 (M.D. Fla. June 14, 2007).

Fire & Cas. Co., 698 So. 2d 618, 620 (Fla. 2d Dist. Ct. App. 1997).

Policy language is considered ambiguous if the language is susceptible to more than one reasonable interpretation. See Travelers Indem. Co. v. PCR Inc., 889 So. 2d 779, 785 (Fla. 2004); see also Cont'l Cas. Co. v. Wendt, 205 F.3d 1258, 1261 (11th Cir. 2000). The courts have, however, cautioned that the fact that a word or phrase is undefined in an insurance policy does not necessarily render that term or phrase ambiguous and in need of interpretation by the court. See State Farm Fire & Cas. Co. v. CTC Development Corp., 720 So. 2d 1072, 1076 (Fla. 1998). In arriving at a reasonable interpretation, the "terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties-not a strained, forced, or unrealistic construction." See Siegle v. Progressive Consumers Ins. Co., 819 So. 2d 732, 736 (Fla. 2002). Moreover, "when a policy provision remains undefined, common everyday usage determines its meaning." See Nateman v. Hartford Cas. Ins. Co., 544 So. 2d 1026, 1028 (Fla. 3d Dist. Ct. App. 1989); see also Hrynkiw v. Allstate Floridian Ins. Co., 844 So. 2d 739, 741-42 (Fla. 5th Dist. Ct. App. 2003) ("When determining the meaning and scope of an exclusion clause or other provisions of an insurance policy, legal niceties, technical terms, and phraseology extracted from the vernacular of the insurance industry should never transcend the common understanding of the ordinary person. Therefore, the proper inquiry is not whether a legal scholar can, with learned deliberation, comprehend the meaning of an insurance policy provision, but instead, whether it is understandable to a layperson. [The court] will apply everyday meaning to the language of the instant policy and not strain for a contrary interpretation.").

In general, coverage clauses in insurance policies are interpreted in the broadest possible manner to effect the greatest amount of coverage. See Westmoreland v. Lumbermens Mut. Cas. Co., 704 So. 2d 176, 179 (Fla. 5th Dist. Ct. App. 1997). In contrast, exclusionary clauses are strictly construed, again in a manner that affords the insured broadest possible coverage. Id. A court may look to parol evidence in interpreting an insurance contract only if there is ambiguity. Fireman's Fund Ins. Co. v. Tropical Shipping and Const. Co., Ltd., 254 F.3d 987, 1003 (11th Cir. 2001).

Pacific Employers Ins. Co. v. Wausau Business Ins. Co., 2007 WL 1729971, at *7-8 (M.D.

Fla. June 14, 2007).

Judge Moore found that because this case was not the typical "insured v. insurer" scenario, the general rule to construe the policies in favor of coverage may not be as applicable. Id. at *11. However, to give Plaintiffs every benefit of the doubt, the undersigned has applied the general rule of construing the policies in favor of coverage. Judge Moore also found that the language of the Employee Exclusion Provision was itself clear, with the exception of the word "short-term," but that the application of the facts to the Employee Exclusion Provision was problematic for summary judgment. Specifically, Judge Moore stated that:

> The Court finds the Employee Exclusion Provision to be ambiguous not because the language is unclear, with the one notable exception of the word "short-term," but rather because under the Employee Exclusion Provision and the facts of this case presented to date by the parties, Mr. Hart's employment status at the time of his injury is susceptible to more than one interpretation. He could be found to be either a "leased worker," and thus, an "employee" excluded from coverage under the Wausau Policies or a "temporary worker," thus, not an employee, and covered under the Wausau Policies.

Id. at *8.[15]

---

[15] Despite this previous finding, Plaintiffs attempt to re-litigate this issue through their post-trial memorandum. Plaintiffs present the Court with several cases in which courts found provisions that mirrored or were substantially similar to the Employee Exclusion Provision here to be ambiguous. Plaintiffs seemingly contend that because policy language the same or similar to the language at issue in this case has been found to be ambiguous, ambiguity must also be present in this case. However, Plaintiffs also admit that in some cases, such as General Agents Ins. Co. of America v. Mandrill Corp., Inc., 2007 WL 2050850 (6th Cir. July 13, 2007) and Scottsdale Ins. Co. v. Carrabassett Trading Co., Ltd., 460 F. Supp. 2d 251 (D. Mass. 2006), courts have found the policy language not to be ambiguous. As will be demonstrated below, the Court finds the latter cases, Scottsdale in particular, to be persuasive. This is because Scottsdale is directly on point whereas the cases cited by Plaintiffs, such as Bituminous Cas. Corp. v. Mike Ross, Inc., 413 F. Supp. 2d 740 (N.D. W.Va. 2006), primarily focus on the minority position that the phrase "furnished to" creates an ambiguity in the policy definition of "temporary worker."

## II.   Decision

### A.   "Special Project"

Plaintiffs claim that the cutting up of railcars was experimental, not part of Berman's ordinary course of business. (Dkt. 150 at p.10; Berman T.1:81). Plaintiffs make this assertion to support their contention that Hart was a "temporary worker," citing to the definition of "temporary help arrangement" appearing in section 468.520(4)(a), Florida Statutes (2007), a statute that is part of Florida's workers' compensation code.

Because the Court can resolve the meaning of the Employee Provision Exclusion without "borrowing" from the Florida Statutes, this statutory support offered by Plaintiffs need not be considered.  However, the Court finds that analysis of this statute is instructive in that the parties' arguments for and against its application provide insight into both the nature of Hart's duties (and whether these duties were related to the conduct of Berman's business) and employment with Berman.

Section 468.520(4)(a), Florida Statutes (2007), defines a "temporary help

_____

See General Agents, 2007 WL 2050850 at *6 (listing minority cases).  The majority of courts considering the "furnished to" language have found to it to unambiguously require the involvement of a third party who supplies the worker.  Id. at *6 (listing majority cases).  Here, Action Labor is the undisputed third party supplier of Hart.

Plaintiffs attempt to distinguish General Agents on the basis that in Florida's workers' compensation law, unlike in Tennessee, there exists a distinction between "leased employees" and "temporary workers."  Plaintiffs cite to sections 468.520(4) and 468.520(4)(a) of Florida Statute § 468.520, which define "employee leasing" and "temporary help arrangement." However, these sections define different types of work arrangements and offer no real distinction between a "leased worker" and a "temporary worker," which would be helpful in our context.

arrangement" as one in which an "organization hires its own employees and assigns them to a client to support or supplement the client's workforce in special work situations such as employee absences, temporary skill shortages, seasonal workloads, and *special assignments and projects*" (emphasis added).  Although the term "special project" never appears in the Wausau Policies, Plaintiffs claim that this definition from section 468.520(4)(a), should inform the Court's ultimate determination of whether Hart was a "temporary worker."

Defendants claim that Plaintiffs' reliance on this "special assignments and projects" language is misplaced because Berman's cutting up of railroad cars for scrap was not a special project and that no evidence demonstrates that this endeavor was a "special project" other than Plaintiffs' "self-serving characterization of it as such in this suit years after Hart's injury occurred." (Dkt. 151 at p.16).

Defendants claim, and Plaintiffs do not appear to dispute, that Berman began processing a high-volume of railcars for scrap in 2000, which it continued to do until 2003 when it was discontinued as unprofitable.  (Berman T.1:81-82, 109, 111, 149).  Mr. Berman testified that railcars provided only another source of scrap for Berman (Berman T.1:113) and that Berman provided no special designation to the cutting up of railcars.  Mr. Berman also stated that cutting scrap metal into smaller pieces relates to the conduct of Berman's business.  Mr. Berman was unable to specify anything distinguishing the processing of railcars from the processing of any of the other industrial scrap items, such as dump trucks (Berman T.1:103) or bulldozers, cranes and earth graders.  (Krufchinski T.2:25).

Plaintiffs also claim that the increase in burners from two to six during the relevant time indicates that railcars constituted a "special project."  However, Plaintiffs fail to specify anything that distinguished the work of burners working on railcars from any other burners in the scrap yard.  As Mr. Berman made clear, Hart, like the other burners employed by Berman, reported to work each day to either Edenfield or Krufchinski and became part of the team out in the yard processing scrap metal.  (Berman T.1:114).  During his employment with Berman, Hart created scrap from any number of sources, not just railcars. (Berman T.1:83).

Krufchinki's testimony also belies Plaintiffs' arguments that railcars were a special project and outside Berman's ordinary course of business.  Krufchinski testified that Berman received industrial scrap from a variety of sources (Krufchinski T.2:24) and that occasionally Berman secured scrap from new sources - in this case railcars. (Krufchinski T.2:25).  Krufchinski also testified that "while everything at Berman had a special name" this endeavor was referred to generally as "railcar processing" or "processing railcars." (Krufchinski T.2:30, 44).  According to Krufchinski, when he asked Action Labor to find a burner he was merely looking for someone who could torch cut scrap. (Krufchinski T.1:35).

Based on the evidence presented, the Court finds that the cutting of railcars was not a "special project."  Railcars served simply as another source of scrap for Berman as part of its regular and ordinary course of business of cutting and processing scrap for sale.

B.     Application of Policy Language to the Facts

Plaintiffs argue that the Wausau Policies' definition of "leased worker" does not apply to Hart because he was not furnished to Berman by a "labor leasing firm."

Brown, Plaintiffs' witness and a former District Manager for Action Labor's North Florida district, testified that as Action Labor's employee, Hart was a temporary employee at Berman.  Brown further claimed that temporary help firms and leasing companies are "two different animals." (Brown T.1:49).  Based on his thirteen years of experience in the business, Brown defined an employee leasing company as "a company that – for instance, if you're a contractor and you can't afford benefits for your people, you take your entire crew, you take them to a leasing company, who basically is a payrolling and insurance broker for them."  (Brown T.1:50-51).

Upon questioning from the Court, Brown clarified his definition by adding that when dealing with a leasing company the client usually identifies the worker it wants and then sends that worker to the leasing company and leases that worker back.  (Brown T.1:71-72).  Brown opined that Action Labor was a temporary help firm because it provides temporary employees for short or long-term assignment (Brown T.1:28; PX 14) based on a day-to-day agreement.  (Brown T.1:34).  Brown also claimed that there were "legal" differences between labor leasing firms and temporary help firms, although he acknowledged that he was not an attorney familiar with those alleged legal differences.  (Brown T.1:51-52).  Brown testified that the time an employee like Hart works for a client company does not affect his status as a temporary employee - even if the employee went to work at the same company every day

15

for months or years.  (Brown T.1:52).

Action Labor provides employees certain benefits, including workers' compensation. (Brown T.1:55).  Action Labor employees enjoy the option to work under a daily or a weekly work ticket, the latter being available to employees who are considered sufficiently trustworthy.  (Brown T.1:57).  Hart used both daily and weekly tickets during his tenure with Berman.  (Brown T.1:58).  Once at Berman, Hart only returned to Action Labor to submit his daily or weekly work ticket.  (Brown T.1:62-63).  Berman assumed the right to exercise daily control over the work that Hart performed at Berman.  (Brown T.1:63).  Berman provided Hart most of his essential tools.  (Brown T.1:64).

Relying on Brown's testimony and definitions from Florida's workers' compensation statutes, Plaintiffs ask the Court to find that Action Labor is a temporary help company and not a labor leasing firm.  However, while the Court found Brown's testimony interesting, ultimately it did not assist much in determining whether Action Labor should be designated a "labor leasing firm" within the meaning of the Wausau Policies.  The distinctions Brown draws between a labor leasing firm and a temporary help company appear to be his own unsupported opinions.  Instead, the Court returns to the language of the Wausau Policies that defines a "leased worker" as a person "leased to [Berman] by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business." (DX1, RP 12; DX 2, RP 249).

Through Action Labor, Berman employed Hart to perform duties related to the ordinary conduct of Berman's business - processing scrap.  Thus, the last prong of the

definition of leased worker, "to perform duties related to the conduct of [Berman's] business" is satisfied.  The Court now determines whether Action Labor and Berman entered into an "agreement" and whether Hart was "leased" to Berman by a "labor leasing firm."

Plaintiffs claim that "there was no testimony regarding any agreement made between Action Labor and Berman at the time Hart was first assigned by Action Labor to report to Berman that suggests that it was understood by *any* party that Hart would be returning on a continuous basis, and in fact, Hart's initial time sheets, completed on a daily basis indicate that no such understanding was in place."  (Dkt. 150 at p. 11).  Testimony from Brown and Mr. Berman, however, demonstrates the existence of an agreement.  See Dkt. 151 at p. 15 for a synopsis of testimony from Brown and Mr. Berman supporting the existence of an agreement; see also Scottsdale Ins. Co. v. Carrabassett Trading Co., Ltd., 460 F. Supp. 2d 251, 252 (D. Mass. 2006) (construing same provision and finding that although there was no formal agreement in place between the parties, it was clear that there was some form of agreement as to the placement of employees).  Further, the conduct of the parties, i.e., the procedures followed by Berman and Action Labor as outlined above, establishes an agreement between the parties.[16]  The Court finds by a preponderance of the evidence that there was an "agreement" in place between Berman and Action Labor as to Hart's employment within the meaning of the Wausau Policies' language.

---

[16]  The daily and weekly work tickets signed by Berman are one such example.  (DX 18).

17

Having found an agreement, the Court considers whether Hart was "leased to [Berman] by a labor leasing firm." The recently decided <u>Scottsdale</u> provides useful insight. In <u>Scottsdale</u> the insured employer argued that the labor firm never used the word "lease" in describing its business and should not be regarded as a "leasing firm." The <u>Scottsdale</u> court rejected that argument, relying on the definition of "lease" from <u>Black's Law Dictionary</u> and stating "a company 'leases' a worker to a client when it gives the client the right to use the worker's services for a period of time in exchange for a fee." <u>Scottsdale</u>, 460 F. Supp. 2d at 256 (citing to Bryan A. Garner, <u>Black's Law Dictionary</u> 907 (8th ed. 2004)). Based on this definition, Hart was "leased" to Berman. The totality of the evidence, including the undisputed fact that Action Labor is in the business of placing its employees at client companies for varying lengths of time in exchange for a fee, also dictates that Action Labor is a "labor leasing firm."

Nevertheless, Plaintiffs argue that <u>Scottsdale</u> is inapplicable because a distinction between "leased" and "temporary" exists in Florida's workers' compensation law. Plaintiffs cite to the definitions of "employee leasing" and "temporary help arrangement" found in section 468.520, Florida Statutes (2007). Plaintiffs claim that this distinction is important because under Florida Statutes, Title XXXII, Regulation of Professions and Occupations (Chapters 454-493), a company *must* obtain a license prior to engaging in the employee *leasing* business. <u>See</u> Fla. Stat. § 468.526 (2007). However, this statutory framework appears inapplicable to this situation. The Court's inquiry must focus on the type of business Action Labor is <u>within the meaning of the Wausau Policies</u>. The insured employer in

18

Scottsdale also argued that the labor firm did not comply with technicalities, such as using the word "lease" in describing its business.   Scottsdale, 460 F. Supp. 2d at 256.   The Scottsdale court rejected this "form over substance" argument, focusing instead on the actual structure of the business relationship.

Thus, the Court need not consider these allegedly analogous statutory definitions offered by Plaintiffs.  Instead, as instructed by Florida law, the Court has focused on the plain language of the Wausau Policies as applied to the facts and determined that Hart was a "leased worker" at the time of his accident.  For the same reason, the Court also declines to consider Defendants' various statutory and common law arguments.

The Court now must determine if Hart was a "temporary worker."  As the court found in Scottsdale, a person might qualify as a "leased worker" under the policy but nonetheless also qualify under the "temporary worker" definition and therefore be entitled to coverage. As previously discussed, the only way Hart might qualify as a "temporary worker" is if he satisfied the third prong of the Wausau Policies' definition of a "temporary worker" - - if Berman leased Hart from Action Labor to meet "short-term" workload conditions.

The testimony of the Wausau claim representatives demonstrates there is no consensus within Wausau about the definition of "short-term" in the Wausau Policies. Both claim representatives, Greasby and DeRosia, testified primarily about their own personal interpretations of the meaning of "short-term." (Greasby T.1:162, 170, 173; DeRosia

T.2:101-102).[17]

Brown, the former Action Labor District Manager and Plaintiffs' witness, testified that he viewed the "day-to-day" nature of Hart's employment with Berman as significant to his determination that Hart was a temporary worker. Brown claimed that if a leasing company were involved the relationship would be "slightly more long term than that." However, Brown also testified that Hart could have continued his daily employment at Berman "indefinitely." (Brown T.1:54-55, 61).

In Scottsdale, which the Court finds persuasive on this issue, the court determined that:

> The plain meaning of the word "short-term" suggests a period of time that is relatively brief and relatively finite. For example, someone hired to complete a specific project or responding to an unexpected temporary demand in goods or services could reasonably be said to have been furnished to meet "short-term" workload conditions. Conversely, "short-term" cannot mean "indefinite" or "open-ended." A reasonable person considering policy language covering injuries to workers provided to meet "short-term" workload conditions would not expect coverage for workers provided for "indefinite" workload conditions.

Scottsdale, 460 F. Supp. 2d at 258.[18]

---

[17] While the Court understands Plaintiffs' motivation in producing these witnesses, their testimony is not particularly pertinent.

[18] Relying on law from multiple states to support its decision, the Scottsdale court defined "short-term" after noting that "[t]he phrase 'short-term' is not defined in the policy. However, the mere fact that a term in an insurance policy is undefined does not create an inherent ambiguity. Instead, the undefined term should be read according to its plain and ordinary meaning." Scottsdale, 460 F. Supp. 2d at 258 (internal citations omitted).

Under Florida law and Eleventh Circuit precedent, this Court's task is the same as the Scottsdale court's. Florida law requires courts to consider the plain meaning of the terms in an insurance contract, even if a term is not defined in the policy. Spinx Intern., Inc. v. Nat. Union

Based on this definition of "short-term" and on the fact that no written contract dictated the length of employment, the court in Scottsdale concluded that the employee could not be considered "short-term." Id. The Scottsdale court concluded its analysis by noting that no record evidence demonstrated that the employee would have left the client at any particular time had he not been injured. Id. According to the testimony of Mr. Berman and Krufchinski this is precisely the situation Hart was in before he was injured.

Plaintiffs attempts to distinguish Scottsdale are unpersuasive.[19] Plaintiffs specifically

---

Fire Ins. Co., 412 F.3d 1224 (11th Cir. 2005); see also Swire Pacific Holdings, Inc. v. Zurich Ins., Co., 845 So. 2d 161, 165 (Fla. 2003) ("The lack of a definition of an operative term in a policy does not necessarily render the term ambiguous and in need of interpretation by the courts.") (internal citations omitted) and Nateman v. Hartford Cas. Ins. Co., 544 So. 2d 1026, 1028 (Fla. 3d Dist. Ct. App. 1989) ("[W]hen a policy provision remains undefined, common everyday usage determines its meaning."). Accordingly, the Court has applied the evidence presented at trial to determine whether the Employee Exclusion Provision excludes Hart from coverage, using the common sense construction of the word "short-term."

[19]   During their closing arguments at trial Plaintiffs cited to In re South Louisiana Sugars Co-op., Inc., 485 F.3d 291 (5th Cir. 2007). In South Louisiana Sugars the central question was whether, under a commercial general liability policy like the one at issue in this case, an injured worker was a leased or temporary worker. The relevant policy language in South Louisiana Sugars is identical to that in this case; the facts were similar, but not identical. The district court granted summary judgment and determined that the injured worker was a leased worker. On appeal, the Fifth Circuit remanded the case to the district court for "further development," finding that the evidence presented in support of summary judgment was insufficient to determine as a matter of law whether the employee was a leased worker. However, the Fifth Circuit does not hold or even intimate that the worker was not a "leased worker" - - it simply remands for "further proceedings."

While South Louisiana Sugars is instructive about what the Fifth Circuit considers insufficient evidence for summary judgment purposes, that is not the posture here where the Court has conducted a trial and reached its decision on a complete record based on the preponderance of the evidence. Thus, the Court's decision here is not inconsistent with South Louisiana Sugars. The Court must acknowledge, however, that Scottsdale, which the Court finds persuasive, was also decided under the summary judgment standard. Nevertheless, the Court finds the facts of Scottsdale to be more on point and the record in Scottsdale to be more fully

claim that "Scottsdale is not instructive . . . because in Scottsdale, the parties agreed that the work arrangement was for an indefinite period of time and the Scottsdale court's reasoning regarding whether a worker['s] status should be determined at the time of the arrangement or retroactively is illogical."  (Dkt. 150 at p. 8).  Plaintiffs claim that "in the instant action, Hart was not placed at Berman for an indefinite period . . . . Berman undertook a special project of cutting railcars that was not typical of its business . . . . The fact that a specific date certain was not established for the completion of the railcar project is not determinative." (Dkt. 150 at p. 8).  Plaintiffs further claim that once the "railcar project" was complete, Hart's employment with Berman would cease.  (Dkt. 150 at p. 8).

The Court has already found that the cutting of railcars was not a "special project" and that railcars were simply another source of scrap for Berman as part of its regular and ordinary business of processing scrap metal.  Moreover, Hart was asked by Berman to cut non-railcar scrap as well.  The evidence also demonstrates that Hart was hired for an indefinite period.  That his injury occurred approximately three months into his work with Berman was happenstance.  Whether the injury occurred three days, three months or even three years into Hart's engagement with Berman is of no moment.  It is the understanding of Berman and Action Labor at the beginning that Hart's employment term would be indefinite (and possibly prolonged) that is important.  See Scottsdale, 460 F. Supp. 2d at 257 (finding that the reasonable expectations of the parties concerning workload conditions, as measured

---

developed than that in South Louisiana Sugars.

at the time the employee is "furnished" governs whether the employee fits within the "short-term" category).  The Court need not decide the exact parameters of the word "short-term" because Hart was employed for an indefinite period to process scrap and that is more than sufficient to negate the idea that his employment was to be for a specified "short-term" period.  Id. at 258 ("[N]o evidence suggests that [the injured worker] would have left . . . at any particular time had he not been injured.").

Accordingly, because Berman did not employ Hart through Action Labor to meet "short-term" workload conditions pursuant to the third prong of the Wausau Policies' definition of a "temporary worker," Hart cannot be considered a "temporary worker." Therefore, the preponderance of the evidence supports the view that Hart was a "leased worker" and not a "temporary worker."  As such, Hart's accident was excluded from coverage under the Wausau Policies.

## III.    Judgment of the Court

Based on these Findings of Fact and Conclusions of Law, the Clerk is hereby DIRECTED to enter a separate judgment in favor of Defendants and against Plaintiffs.[20]

---

[20]  The Court addressed the motions in limine (Dkts. 118, 119, 120 and 121) on the record at trial; these are therefore terminated.

DONE and ORDERED in Chambers at Jacksonville, Florida this 2nd day of October

2007.

TIMOTHY J. CORRIGAN
United States District Judge

Copies to:      Counsel of Record